UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**SHASTRI BOOTHE,** *et al.*,

Plaintiffs,

v.

**ISLAMIC REPUBLIC OF IRAN,**

Defendant.

No. 22-cv-1747 (TSC)

---

**MEMORANDUM OPINION**

Plaintiffs are six U.S. service members, each of whom was injured in terrorist attacks while deployed to Afghanistan, and thirteen members of their immediate families.[1] They sued the Islamic Republic of Iran under the Foreign Sovereign Immunities Act ("FSIA"), alleging that Iran provided material support to a syndicate of terrorist groups which enabled those groups to carry out the attacks which injured Plaintiffs. Compl. ¶¶ 1, 2, 10–33, 162–66, 176, ECF No. 1. After Iran failed to respond to service of process, the Clerk of the Court entered default. *See* Entry of Default, ECF No. 15. Plaintiffs now move for a default judgment and ask the court to find Iran liable for their injuries. *See* Pls.' Mot. for Default J., ECF No. 20. For the reasons below, the court will GRANT in part and DENY in part Plaintiffs' Motion.

---

[1] The Service Member Plaintiffs are Shastri Boothe, Jared Bland, Joshua Chambers, John Mitchell III, Alex Murtha, and Brian Worbington. The Family Member Plaintiffs are M.B. (Shastri Boothe's family); G.B. and J.B. (Jared Bland's family); Erin, Kevin, and Nancy Chambers (Joshua Chambers' family); John Mitchell Jr., Diane Mitchell, Stacey Atkins, and Sally Mitchell (John Mitchell III's family); Kelley McHenry (Alex Murtha's family); and Wendy and Constance Worbington (Brian Worbington's family).

## I.    LEGAL BACKGROUND

Under the FSIA, foreign nations are generally immune from the reach of American courts. *See* 28 U.S.C. § 1604.  The FSIA established, however, several exceptions to foreign sovereign immunity, including the "terrorism exception," which is codified at 28 U.S.C. § 1605A(a)(1).  The terrorism exception withdraws immunity "from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1057 (D.C. Cir. 2024) (quoting Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241) (cleaned up).  The FSIA also contains "a cause of action for U.S. citizens, members of the U.S. armed forces, and U.S. government employees who have been injured by foreign states' acts or sponsorship of terrorism."  *Id.* (citing 28 U.S.C. § 1605A(c)).

Foreign states accused of sponsoring terrorism often do not appear to defend suits brought against them.  *See Borochov*, 94 F.4th at 1058.  When that happens, the Clerk of the Court is required to enter default against them.  *See* Fed. R. Civ. Pro. 55(a).  But generally, the plaintiff "must [then] apply to the court for a default judgment."  *See id.* 55(b).  The "entry of a default judgment is not automatic."  *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  Before a default judgment can be entered in an FSIA case, three prerequisites must be met.

First, the court must have subject matter jurisdiction.  *Borochov*, 94 F.4th at 1060.  "Here, subject-matter jurisdiction exists only if [Plaintiffs'] claims fall within one of the FSIA's exceptions to foreign sovereign immunity," as "these exceptions are the 'sole bases for obtaining jurisdiction over a foreign state in federal court.'"  *Id.* (quoting *Permanent Mission of India to the*

*U.N. v. City of New York*, 551 U.S. 193, 197 (2007)) (cleaned up).  Second, Plaintiffs must show that the court has personal jurisdiction over Iran.  *See Mwani*, 417 F.3d at 6.

Finally, the FSIA requires "each plaintiff" seeking a default judgment to "establish his claim or right to relief by evidence satisfactory to the court."  *Borochov*, 94 F.4th at 1058 (quoting 28 U.S.C. § 1608(e)) (cleaned up).  This requirement grants "foreign sovereigns a special protection akin to that assured by the federal government" by [Federal Rule of Civil Procedure] 55(e) and seeks to guard against "claims that are unfounded."  *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014).  In assessing whether a plaintiff has put forth satisfactory evidence, the court "must draw [its] findings of fact . . . from admissible testimony in accordance with the Federal Rules of Evidence."  *Han Kim v. Dem. People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014) (cleaned up).  Nevertheless, the FSIA gives courts the flexibility—and "indeed, . . . the obligation—to adjust evidentiary requirements to differing situations" so that state sponsors of terrorism cannot "effectively immunize themselves" by refusing to appear in court and subject themselves to discovery.  *Id.* at 1048 (cleaned up).  Accordingly, "the quantum and quality of evidence that might satisfy a court can be less than that normally required."  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).

## II.    ISSUES OF EVIDENCE

Before this court can make its findings of fact, it must resolve Plaintiffs' evidentiary requests.  The first is that the court take judicial notice of and "adopt the key findings of fact and conclusions of law" made by another district court in *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835, 2022 WL 2817730 (D.D.C. July 19, 2022).  Pls.' Mem. Supp. Default J. at 10, ECF No. 20-1 ("Pls.' Br.").  Federal Rule of Evidence 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial

jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." But "the consensus" among courts in this District is that we "typically cannot take judicial notice of prior proceedings 'for the purpose of accepting the truth of the earlier court's findings and conclusions.'" *Sibley v. Islamic Republic of Iran*, No. 23-cv-600, 2025 WL 1928036, at *15 (D.D.C. July 14, 2025) (quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010)). That is especially so with respect to *Cabrera*'s findings of fact because those findings were made on a motion for default judgment without "the full benefits of adversarial litigation" and "thus lack the absolute certainty with which they might otherwise be afforded." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010). Accordingly, the court will not adopt *Cabrera*'s findings of fact.

The court will, however, take judicial notice of evidence from *Cabrera* "without necessitating the formality of having that evidence reproduced" and use that evidence to reach its "own, independent findings of fact." *Rimkus*, 750 F. Supp. 2d at 172. In particular, the court will judicially notice the testimony and expert reports of Dr. Colin Clarke, Lt. Col. Steven Wood (Ret.), and William Roggio—testimony and reports admitted by the *Cabrera* Court during a three-day evidentiary hearing in 2021.[2] Because *Cabrera* and this case involve the same state sponsor of terrorism—namely, Iran—and the material support it provided to the same terrorist syndicate in Afghanistan during overlapping timeframes, it is efficient and proper to take judicial notice of this evidence. *See Baker v. Islamic Republic of Iran*, No. 22-cv-2765, 2025 WL 2480075, at *6

---

[2] Roggio's report in *Cabrera*, No. 19-cv-3835, is docketed in that case as ECF No. 59-1. Dr. Clarke's report is docketed as ECF No. 59-2, and Lt. Col. Wood's report is docketed as ECF No. 59-3. In this case, these three reports are marked respectively as Plaintiffs' Exhibits 1, 2, and 3 and are docketed as ECF No. 22, ECF No. 23, and ECF Nos. 20-2 to 21-2. Separately, Dr. Clarke and Lt. Col. Wood each submitted a new report specific to this case. These two reports are marked as Exhibits 4 and 5 and docketed as ECF No. 24-1 and ECF No. 24-2.

(D.D.C. Aug. 28, 2025) (taking judicial notice of testimony from *Cabrera* in a case with similar facts and claims).

The *Cabrera* Court qualified Dr. Clarke and Roggio as experts in "Middle Eastern terrorism" and Lt. Col. Wood as an expert in "attack attribution analysis." 2022 WL 2817730, at *4–5; *see also Baker*, 2025 WL 2480075, at *4 (likewise finding Clarke qualified as an expert in Middle Eastern terrorism and Wood qualified as an expert in attack attribution analysis). This court is independently satisfied with the qualifications of all three. An expert witness must be qualified by knowledge, skill, experience, training, or education; his testimony must be based on sufficient facts or data; and his opinion must reflect a reliable application of reliable principles and methods. *See* FED. R. EVID. 702.

Dr. Clarke is Director of Research at an intelligence and security consulting firm and holds a Ph.D. from the University of Pittsburgh's Graduate School of Public and International Affairs, where his dissertation focused on insurgent groups. *See* Ex. 4, Expert Report of Colin P. Clarke, Ph.D., at 4–5, ECF No. 24-1 ("Clarke Report (Mar. 2025)"). He spent a decade at the RAND Corporation working on issues related to Afghanistan, terrorism, and state sponsors of terrorism; was an assistant professor at Carnegie Mellon University; and has authored several books on these subjects. *Id.*; *see also* Ex. 4, App. I at 1 (Curriculum Vitae of Dr. Clarke). In drawing his conclusions, Dr. Clarke relied on various primary sources, including statements made by terrorist groups and their supporters as well as U.S. government sources. Dr. Clarke cross-checked his conclusions against the secondary literature of other experts in the field. *See* Clarke Report (Mar. 2025) at 7–8, 12–30. Courts "have consistently held" that reliance on sources like government reports, statements made by terrorist groups, and the secondary literature "provide an adequate basis for expert testimony on terrorism." *Owens v. Republic of Sudan*, 864 F.3d 751, 791 (D.C.

Cir. 2017) (citing *United States v. Damrah*, 412 F.3d 618, 625 & n.4 (6th Cir. 2005) and *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 704–05 (7th Cir. 2008)).

Lt. Col. Wood is an expert on insurgent terrorist tactics in Afghanistan, with a focus on improvised explosive devices ("IEDs") and the Taliban. *See* Ex. 5, Expert Report of Steven A. Wood ¶¶ 1–6, ECF No. 24-2 ("Wood Report (Mar. 2025)"). He is a retired U.S. Army commander who served on the Joint Improvised Explosive Device Defeat Organization, as Commanding Officer of the Counter-IED Operations Integration Center Afghanistan, and as a Senior Advisor to Afghanistan Ground Forces. *See* Ex. 5, Annex A (Curriculum Vitae of Lt. Col. Wood). His report is primarily based on declassified U.S. military intelligence reporting, official government findings, and witness accounts. *See* Wood Report (Mar. 2025) ¶ 5. In forming his opinions, he reviewed the past activities and tactics of terrorist groups in different regions of Afghanistan. *See id.* ¶¶ 20–73.

William Roggio is a Senior Fellow at the Foundation for Defense of Democracies who focuses his research on terrorist groups, including the Taliban. While working as a journalist, Roggio embedded with U.S. forces in Iraq and Canadian forces in Afghanistan. *See* Ex. 1, Expert Report of William Roggio ¶¶ 1–2, ECF No. 20-2 ("Roggio Report"). In arriving at his conclusions, he reviewed statements by terrorist organizations and U.S. government reports and cross-checked these primary sources against the work of other scholars and journalists. *See id.* ¶¶ 11–22, 182–257. Given each of these individuals' credentials and their reliable application of reliable sources and methods, the court qualifies Dr. Clarke and Roggio as experts in Middle Eastern terrorism and

Lt. Col. Wood as an expert in terror attack attribution analysis. Their reports are admitted into evidence.[3]

### III.    FINDINGS OF FACT

Based on the declarations, exhibits, and expert reports submitted by Plaintiffs, as well as the evidence from *Cabrera* of which the court takes judicial notice, the court makes the following findings of fact:

Each Plaintiff has been a U.S. citizen since birth.[4]  Defendant Iran is a foreign state that has been designated as a state sponsor of terrorism by the U.S. State Department since 1984. *See* Clarke Report (Mar. 2025) at 30; *see also* U.S. DEP'T OF STATE, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Mar. 5, 2026).[5]  In 2007, the State Department characterized Iran as "the most active state sponsor of terrorism."  Roggio Report

---

[3]  Plaintiffs also ask that the court qualify Chad Staller and Stephen Dripps of the Center for Forensic Economic Studies as experts for purposes of estimating the economic loss suffered by certain plaintiffs. *See* Pls.' Br. at 18 n.5.  The court will discuss Staller and Dripps' qualifications in the Damages section below. *See infra* Section V.

[4]  Ex. 10, Decl. of Shastri Boothe ¶¶ 1, 3, ECF No. 25-5 ("Boothe Decl."); Ex. 11, Decl. of Jared Bland ¶ 2, ECF No. 25-6 ("Bland Decl."); Ex. 12, Decl. of Joshua Chambers ¶ 1, ECF No. 26 ("Chambers Decl."); Ex. 13, Decl. of Kevin Chambers ¶ 1, ECF No. 27-1; Ex. 14, Decl. of Nancy Chambers ¶ 1, ECF No. 27-2; Ex. 15, Decl. of Erin Chambers ¶ 1, ECF No. 27-3; Ex. 16, Decl. of John Mitchell III ¶ 1, ECF No. 27-4 ("Mitchell Decl."); Ex. 17, Decl. of John Mitchell Jr. ¶ 1, ECF No. 27-5; Ex. 18, Decl. of Diane Mitchell ¶ 1, ECF No. 27-6; Ex. 19, Decl. of Stacey Atkins ¶ 1, ECF No. 27-7; Ex. 20, Decl. of Sally Mitchell ¶ 1, ECF No. 27-8; Ex. 21, Decl. of Alex Murtha ¶ 1, ECF No. 28-1 ("Murtha Decl."); Ex. 22, Decl. of Kelley McHenry ¶ 1, ECF No. 28-2; Ex. 23, Decl. of Brian Worbington ¶ 1, ECF No. 29 ("Worbington Decl."); Ex. 24, Decl. of Wendy Worbington ¶ 1, ECF No. 31-1; Ex. 25, Decl. of Constance Worbington ¶ 1, ECF No. 31-2.

[5] The court may take judicial notice of information published on official government websites. *Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 85 (D.C. Cir. 2024) (citing FED. R. EVID. 201(b)) (taking judicial notice of government reports); *Strauss v. Islamic Republic of Iran*, No. 22-cv-52, 2025 WL 740456, at *10 (D.D.C. Mar. 7, 2025) (taking judicial notice of information on the official website of the U.S. Department of State).

¶ 125.  At all relevant times, Iran provided material support and resources to a syndicate of terrorist groups operating in Afghanistan, including the Taliban.  *See* Clarke Report (Mar. 2025) at 3, 30.

### A.  The Taliban

The Soviet Union's withdrawal from Afghanistan in 1989 created a power vacuum that various warlords and terrorist groups tried to fill.  *See* Ex. 2, Expert Report of Dr. Colin A. Clarke at 6, ECF No. 59-2 ("Clarke Report (Sept. 2021)").  The Taliban emerged as one of these groups. Founded in 1994, it worked to establish an Afghan government rooted in strict Islamic fundamentalism.  *See* Clarke Report (Mar. 2025) at 9; *see also* Roggio Report ¶ 36; Clarke Report (Sept. 2021) at 8–9.  As the Taliban expanded its territory, it recruited other fighters, including Jalaluddin Haqqani and his Haqqani Network.  *See* Clarke Report (Mar. 2025) at 8–9; Roggio Report ¶ 59.  Haqqani formally joined the Taliban in 1995.  Clarke Report (Mar. 2025) at 8–9.  His support enabled the Taliban to seize control of Kabul, Afghanistan's capital city, in 1996.  *See* Clarke Report (Sept. 2021) at 8.  The Taliban then formed the Islamic Emirate of Afghanistan and awarded Haqqani the position of minister of borders and tribal affairs and a position on the Taliban's leadership council.  *See id.* at 9; Roggio Report ¶ 62.

As the Taliban consolidated power across Afghanistan, another terrorist group, al-Qaeda, was expelled from Sudan.  Clarke Report (Sept. 2021) at 9.  Haqqani convinced the Taliban to invite al-Qaeda and its leader, Osama bin Laden, to relocate to Afghanistan.  Roggio Report ¶ 86; Clarke Report (Mar. 2025) at 9.  It was while in Afghanistan under the Taliban's protection that al-Qaeda launched the September 11 attacks against the United States.  Roggio Report ¶¶ 87–93.

Afghanistan refused to surrender bin Laden to the United States following the September 11 attacks.  In response, the United States invaded Afghanistan and toppled the Taliban regime. Roggio Report ¶¶ 42, 93; Clarke Report (Mar. 2025) at 9–10.  As the new U.S.-backed government

of Afghanistan took shape, the Taliban began plotting its comeback with the help of Iran and others.  Roggio Report ¶ 44.  By 2003, the Taliban began to formally launch an insurgency from inside Iran.  Clarke Report (Sept. 2021) at 10.

Although this insurgency was decentralized, the Taliban nevertheless remained a single, coordinated entity and regularly issued directives to syndicate members through its leadership council, the Quetta Shura (also known as the Rahbari Shura).  Clarke Report (Sept. 2021) at 11, 23; Roggio Report ¶¶ 51–55.  To maintain overall control, the Quetta Shura worked to centralize finances, including through taxes on regional shuras and the drug trade, which allowed the Taliban's central leadership to maintain loyalty by dispensing funds to different units.  Clarke Report (Sept. 2021) at 25, 33; *see also* Clarke Report (Mar. 2025) ("[T]he Taliban's central leadership . . . facilitates financial and resource sharing vertically and horizontally throughout the organization.").  What emerges, then, is a picture of a terrorist entity that had decentralized operations but a centralized financing organization.

In 2003, when the insurgency was beginning, the Haqqani Network reaffirmed its allegiance to the Taliban's central Quetta Shura.  The Haqqani Network recognized the authority of the Quetta Shura in exchange for "funding and two seats" on the Quetta Shura.  Clarke Report (Sept. 2021) at 27.  The Haqqani Network tightly controlled the allocation of resources to local Haqqani insurgents.  *Id.*  In 2007, the new leader of the Haqqani Network, Sirajuddin Haqqani, sought even more funding from the Quetta Shura and a more prominent role in its leadership, though he was careful to not question the primacy of the Quetta Shura.  *Id.* at 19–20.

During the period when the attacks against Plaintiffs took place, the Haqqani Network "established its reputation as one of the most lethal elements of the Taliban."  Clarke Report (Sept. 2021) at 21.  It maintained its historic dominance over the Paktia, Paktika, and Khost Provinces,

and "expanded its operations outward into the surrounding Afghan provinces," including Logar. *See* Roggio Report ¶ 77; *see also* Clarke Report (Mar. 2025) at 21–25; Clarke Report (Sept. 2021) at 19. In 2005, Sirajuddin Haqqani identified himself as the head of the Taliban military committee overseeing Logar, though there is some indication that the Quetta regional shura may have been stronger in Logar. *See* Clarke Report (Mar. 2025) at 24. Overall, the Taliban was stronger than non-Taliban insurgents in Logar. *See id.* at 25. Both the Quetta regional shura and the Haqqani Network were loyal to the Taliban's central leadership. *See* Clarke Report (Sept. 2021) at 28.

### B. Iran's Support for the Taliban

At all relevant times, Iran provided material support and resources to the Taliban, including weapons, training, and funds. *See* Roggio Report ¶¶ 149, 160–62, 182–201. Although Iran has sectarian differences with the Taliban, it put those differences aside to cooperate towards a shared goal—inflicting casualties on U.S. and Coalition forces in Afghanistan. *See id.* The systematic nature of Iran's provision of weapons indicates that Iran's support was provided with the approval of senior Iranian officials. Roggio Report ¶ 186.

As is most relevant here, Iran provided "substantial financing" for Taliban operations. Clarke Report (Mar. 2025) at 35. In particular, Iran placed a bounty of $1,000 on the head of each American soldier. *Id.* at 36; *see also* Roggio Report ¶ 224. Evidence indicates that Iran provided large payments to Taliban commanders, who then distributed funds to different fighters. Roggio Report ¶¶ 225–28; *see also* Clarke Report (Mar. 2025) at 36. Iranian officials also helped finance Taliban operations through trafficking Afghan opium and heroin across borders. *See* Roggio Report ¶¶ 229–30; Clarke Report (Mar. 2025) at 39–45. Drug proceeds were a critical revenue source for the Taliban's central finance operation. *See* Clarke Report (Sept. 2021) at 76.

C.  **The Attacks on the Service Member Plaintiffs**

Sufficient evidence establishes that the Taliban carried out attacks on Captain Shastri Boothe, Specialist Jared Bland, and Private Alex Murtha—attacks which killed American or American-allied personnel and Afghan civilians.  There is no evidence in the record, however, that the attacks on Sergeant Brian Worbington, Airman Joshua Chambers, and Airman John Mitchell III resulted in any deaths other than the deaths of the terrorists who carried out the attacks.  For the reasons explained below, *see infra* Section IV.A, the court lacks jurisdiction over claims arising out of nonfatal attacks, and therefore need not determine whether the Taliban was responsible for those attacks.

1.  August 7, 2012, Attack—Captain Shastri Boothe

Shastri Boothe was injured in a suicide bombing attack at Forward Operating Base Shank in Logar Province, Afghanistan on August 7, 2012, while serving as a Captain in the U.S. Army. *See* Wood Report (Mar. 2025) ¶¶ 76–78; Boothe Decl. ¶ 7.  The suicide bomber managed to pass through the Base's first security checkpoint before detonating a vehicle-borne improvised explosive device (SVBIED) at the second checkpoint.  Wood Report (Mar. 2025) ¶ 77.  Captain Boothe was inside a nearby medical tent when the SVBIED detonated.  *Id.* ¶ 76; Boothe Decl. ¶ 7. The blast caused the tent to collapse onto her.  Wood Report (Mar. 2025) ¶ 78.  Captain Boothe was thrown onto the ground and suffered a traumatic brain injury, among other injuries.  *Id.*; *see also* Boothe Decl. ¶ 7.  Dozens of others at the base were wounded and Afghan personnel were killed.  Wood Report (Mar. 2025) ¶¶ 78, 81.

Sufficient evidence establishes that the Taliban was responsible for the attack, specifically either the Quetta regional shura or the Taliban's Haqqani Network, though it appears more likely that it was the Quetta regional shura given its relative dominance in the Logar Province.  *See* Clarke Report (Mar. 2025) at 24.  As several articles document, the Taliban claimed responsibility for the

attack. Wood Report (Mar. 2025) ¶ 85 & n.93 (citing article); *see also* Clarke Report (Mar. 2025) at 25, n.104, n.105 (citing articles). The Taliban's claim of responsibility is credible given their robust presence and operational dominance in the Logar Province throughout August 2012. Wood Report (Mar. 2025) ¶ 80; Clarke Report (Mar. 2025) at 24–25. The tactic used was also similar to previous SVBIED attacks perpetrated by Taliban elements. *See* Wood Report (Mar. 2025) ¶¶ 80–82.

2.    June 20, 2012, Attack—Specialist Jared Bland

Jared Bland was injured in a suicide vest attack in Khost, Afghanistan on June 20, 2012, while serving as a Specialist in the U.S. Army. *See* Wood Report (Mar. 2025) ¶ 116; Bland Decl. ¶ 12. Bland was directing traffic outside a mosque when a suicide bomber jumped out of a vehicle and detonated a vest containing 25 pounds of explosive material and ball bearings. Bland Decl. ¶ 12; *see also* Wood Report (Mar. 2025) ¶ 121. The force of the explosion threw Bland six feet into the air, rendering him unconscious for roughly four minutes. Bland Decl. ¶ 12. The attack wounded Bland and several others and killed three U.S. service members, the unit's Afghan interpreter, two Afghan police officers, and sixteen Afghan civilians. Wood Report (Mar. 2025) ¶¶ 116, 122.

Sufficient evidence establishes that this attack was likely committed by the Taliban's Haqqani Network. In June 2012, the Haqqani Network very likely had operational dominance in the Khost Province, which was a historic and longtime stronghold for the group. *See* Clarke Report (Mar. 2025) at 21–22; Wood Report (Mar. 2025) ¶ 124. Although another insurgent group operated in Khost, it was not a major area of operations for them, and the Haqqani Network was stronger and more active. *See* Clarke Report (Mar. 2025) at 21–22. The method used—suicide vests—was a signature of the Haqqani Network, which had a special brigade dedicated to suicide

bombings.  *See* Wood Report (Mar. 2025) ¶ 126.  The Taliban, moreover, claimed responsibility for several other suicide bombing attacks in the area around the same period.  Clarke Report (Mar. 2025) at 21–22.  Although the Taliban is not documented to have claimed responsibility for this precise attack, it may have refrained from doing so because of the significant number of innocent civilians who died in the attack outside a mosque.  *See* Wood Report (Mar. 2025) ¶¶ 111, 122.

### 3. November 16, 2013, Attack—Airman Joshua Chambers

Joshua Chambers was injured in an ambush attack in Parwan Province, Afghanistan on November 16, 2013, while serving as a Senior Airman in the U.S. Air Force.  Chambers Decl. ¶¶ 5–7.  Chambers was traveling in a three-vehicle convoy when terrorists with guns, rocket-propelled grenades, and mortars ambushed them.  *Id.* ¶¶ 5–6.  Chambers was shot in the right leg while manning a machine gun.  *Id.* at 7.  Even after he was injured, Chambers continued to engage the enemy before being evacuated for treatment two hours later.  *Id.* at 8.  In their account of the attack, Plaintiffs identify no evidence that any non-terrorists died in the attack.  *See* Pls.' Br. at 57–61.  Nothing in Chambers's declaration or the attached exhibits indicate that there were any non-terrorist deaths.  *See generally* Chambers Decl.

### 4. June 26, 2013, Attack—Airman John Mitchell III

John Mitchell III was injured in a rocket attack on Forward Operating Base Fenty in Afghanistan's Nangarhar Province on June 26, 2013, while serving as an Airman First Class in the U.S. Air Force.  *See* Clarke Report (Mar. 2025) at 26; Mitchell Decl. ¶¶ 3, 5.  The rocket exploded ten feet away from Mitchell, knocking him unconscious and injuring at least one other U.S. soldier.  *Id.* ¶ 5.  Plaintiffs cite no evidence that anyone died in the attack.  *See* Pls.' Br. at 78–79.  Neither Mitchell's declaration nor the attached exhibits mention any deaths.

5. June 3, 2013, Attack—Private Alex Murtha

Alex Murtha was injured in a suicide bombing attack in Afghanistan's Paktia Province on June 3, 2013, while serving as a Private Second Class in the U.S. Army. *See* Murtha Decl. ¶¶ 3–4. Murtha was outside a school when a suicide bomber on a motorcycle detonated explosives ten feet away from Murtha. *Id.* ¶ 4. The explosion wounded Murtha and several others, and killed two U.S. service members, ten Afghan school children, and an Afghan police officer. *Id.*; *see also* Murtha Decl. – Ex. C (news article confirming these fatalities).

Sufficient evidence indicates that this attack was committed by the Taliban's Haqqani Network. Paktia Province was a stronghold of the Haqqani Network in June 2013. *See* Clarke Report (Mar. 2025) at 22–23; Wood Report (Mar. 2025) ¶ 108. The Taliban had claimed responsibility for several attacks against American soldiers in Paktia Province around the same time. Clarke Report (Mar. 2025) at 23. Although it did not claim responsibility for this attack, that is likely because the attack killed 10 Afghan school children, which would have been embarrassing for the Taliban. Wood Report (Mar. 2025) ¶ 112. The attack method used—an SVBIED—is characteristic of the Haqqani Network. *See id.* ¶¶ 110, 115.

6. January 17, 2013, Attack—Sergeant Brian Worbington

Brian Worbington was injured in a pressure-plate IED attack in the Helmand Province on January 17, 2013, while serving as a Gunnery Sergeant in the U.S. Marine Corps. *See* Worbington Decl. ¶¶ 7–8. After exiting their convoy of armored vehicles, Worbington and his unit came under machine gun fire. *Id.* ¶ 8. Worbington and his unit quickly returned to their vehicles. *Id.* Another vehicle in the convoy hit an IED. *Id.* As Worbington's vehicle maneuvered to assist the other vehicle, Worbington's vehicle hit an IED as well, which exploded under the vehicle. *Id.* ¶ 9. The explosion injured Worbington and rendered him and his fellow soldiers unconscious for at least

five minutes. *Id.* After regaining consciousness, Worbington continued to exchange fire with the attackers for about an hour before being airlifted to a medical facility. *Id.* Plaintiffs cite no evidence that anyone was killed in the attack. *See* Pls.' Br. at 84–85. Nor is there any indication in Worbington's declaration or the attached exhibits that the attack involved fatalities.

7. The Family Member Plaintiffs

The Family Member Plaintiffs were not present in Afghanistan but are family members of the six Service Member Plaintiffs.[6] Each of the Family Member Plaintiffs suffered emotional injuries as a result of the Service Member Plaintiffs' injuries from the attacks.[7]

## IV. ANALYSIS

### A. Subject Matter Jurisdiction

The court has subject matter jurisdiction over the claims of Plaintiffs Shastri Boothe, Jared Bland, and Alex Murtha, as well as their family members. The court lacks jurisdiction, however, over the claims of Joshua Chambers, John Mitchell III, and Brian Worbington—as well as their family members—because Plaintiffs cite no evidence that those claims fall within an exception to Iran's sovereign immunity.

The "FSIA begins with a presumption of immunity." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). Plaintiffs bear an initial burden

---

[6] Boothe Decl. ¶¶ 3–4; Bland Decl. ¶ 2; Chambers Decl. ¶¶ 2, 6; Ex. 13, Decl. of Kevin Chambers ¶ 1; Ex. 14, Decl. of Nancy Chambers ¶ 1; Ex. 17, Decl. of John Mitchell Jr. ¶ 1; Ex. 18, Decl. of Diane Mitchell ¶ 1; Ex. 19, Decl. of Stacey Atkins ¶ 1; Ex. 20, Decl. of Sally Mitchell ¶ 1; Ex. 22, Decl. of Kelley McHenry ¶ 1; Worbington Decl. ¶¶ 2, 4.

[7] Boothe Decl. ¶¶ 19–28; Bland Decl. ¶¶ 23–26; Ex. 13, Decl. of Kevin Chambers ¶¶ 18–36; Ex. 14, Decl. of Nancy Chambers ¶¶ 9–44; Ex. 15, Decl. of Erin Chambers ¶¶ 11–38; Ex. 17, Decl. of John Mitchell Jr. ¶¶ 3–5; Ex. 18, Decl. of Diane Mitchell ¶¶ 4–7; Ex. 19, Decl. of Stacey Atkins ¶¶ 3–7; Ex. 20, Decl. of Sally Mitchell ¶¶ 4–7; Ex. 22, Decl. of Kelley McHenry ¶¶ 8–18; Ex. 24, Decl. of Wendy Worbington ¶¶ 5–12; Ex. 25, Decl. of Constance Worbington ¶¶ 4–7.

of producing evidence that one of the FSIA's exceptions to sovereign immunity applies. *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 104 F.4th 287, 294 (D.C. Cir. 2024). "These exceptions are the sole bases for obtaining jurisdiction over a foreign state in federal court in a civil case." *Borochov*, 94 F.4th at 1060 (cleaned up).

Plaintiffs rely exclusively on the terrorism exception codified at 28 U.S.C. § 1605A, which provides jurisdiction in cases in which: (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Plaintiffs easily satisfy the first three elements—they seek only money damages, Iran is a foreign state, and each Plaintiff suffered physical injuries, emotional injuries, or both. *See* Compl. ¶¶ 180, 186; *see also supra* Section III. This leaves the fourth and fifth elements.

1. Act of Extrajudicial Killing

Turning first to the fifth element, Plaintiffs' theory is that their injuries were caused by acts of extrajudicial killing. *See* Pls.' Br. at 20–23. For a terrorist attack to qualify as an act of extrajudicial killing, the attack must result in the death of someone other than the perpetrators. *Borochov*, 94 F.4th at 1060, 1062. "The word 'killing,'" after all, "refers to an action resulting in the death of another." *Id.* at 1061. "By requiring an actual 'killing,' Congress closed the door to attempted, but failed, killings." *Id.*; *see also Cabrera v. Islamic Republic of Iran*, 752 F. Supp. 3d 183, 189 (D.D.C. 2024) (In *Borochov*, "the Circuit made clear that § 1605A only confers jurisdiction over a claim if the relevant attack resulted in a *completed* extrajudicial killing." (emphasis in original)). Captain Boothe, Specialist Bland, and Private Murtha were injured in

attacks which killed individuals other than the terrorists who carried out the attacks, and thus both they and their family members have satisfied this element.

There is no evidence in the record, however, that the attacks which injured Sergeant Worbington, Airman Chambers, and Airman Mitchell resulted in any deaths other than the deaths of the terrorists who carried out the attacks. *See supra* Section III.C. "Because the perpetrator did not kill anyone in the attack[s] that injured [these Plaintiffs], no extrajudicial killing occurred, and neither could there have been material support for 'such an act.'" *Borochov*, 94 F.4th at 1061.

Plaintiffs resist this straightforward conclusion, arguing that the "specific micro attack[s]" on Chambers, Mitchell, and Worbington should be treated as "part of a single, continuous terror campaign wherein extrajudicial killings occurred." Pls.' Br. at 22. Because there was "a continuous, protracted macro-attack on U.S. armed forces personnel in Afghanistan from 2006-2019 that killed thousands," Plaintiffs contend, "the lack of a simultaneous fatality in a given micro-attack is immaterial for the purposes of assessing subject-matter jurisdiction." *Id.* at 23. The court disagrees.

As Judge Howell persuasively explained in *Baker*, each attack constitutes "a separate and distinct occurrence, set apart from other attacks by time[,] location, the weapons and tactics used, and other specific facts." 2025 WL 2480075, at *17. While the syndicate's separate attacks may have formed part of the same terrorist campaign, "a campaign is made up of a series of separate actions, and the fact that these actions are tied together by a broader goal does not serve to conflate them into the same action." *Id.* Similarly, in *Cabrera*, Judge Bates dismissed the claim of a plaintiff who was injured in an IED explosion that resulted in no deaths, even though a related, coordinated IED explosion at a nearby location the following day resulted in a death. 752 F. Supp. 3d at 191–92. Judge Bates concluded that for the terrorism exception to apply, "the extrajudicial

Page 17 of 37

killing [must have] occurred in the same attack, not simply in a series of coordinated attacks." *Id.* at 190. And in yet another decision, Judge Friedrich contrasted § 1605A's use of the narrow term "act" with a different FSIA provision's use of the broader phrase "act or incident." *Hansen v. Islamic Republic of Iran*, No. 22-cv-477, 2024 WL 3026517, at *8 (D.D.C. June 17, 2024). "Since Congress employed the more inclusive term in one provision but not the other, this strongly suggests that the terrorism exception has a narrower scope." *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859, 2024 WL 3566132, at *5 (D.D.C. July 29, 2024).

Plaintiffs' contrary interpretation cannot be squared with the general principles for interpreting the FSIA. It is well established that courts must narrowly construe the FSIA's exceptions in favor of foreign sovereigns and not enlarge those exceptions beyond the statutory language. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (emphasizing that the FSIA's exceptions to sovereign immunity "are narrowly construed in favor of the sovereign and are not enlarged beyond what the [statutory] language requires" (cleaned up)). "Faithful adherence to the text is critical because waivers of foreign sovereign immunity involve complex and delicate foreign-policy judgments—decisions that fall outside the judicial wheelhouse." *Borochov*, 94 F.4th at 1062. "The courts, in other words, should not open the door to litigation against foreign governments that the Political Branches have not clearly authorized." *Id.*

In light of caselaw calling for narrow construction of the terrorism exception, the court must reject Plaintiffs' expansive theory that a series of distinct attacks occurring across Afghanistan over a thirteen-year period somehow constitutes a single, extended "act of extrajudicial killing." Because there is no evidence that a non-terrorist was killed during the attacks which injured Sergeant Worbington, Airman Chambers, and Airman Mitchell, the court

lacks subject matter jurisdiction over their claims and those of their family. The court will therefore DENY the Motion for Default Judgment with respect to Joshua Chambers, John Mitchell III, Brian Worbington, and their respective family members, and dismiss their claims.

2. Causation

The court has already determined that each remaining plaintiff was injured in a fatal terrorist attack carried out by the Taliban—specifically, by either the Haqqani Network or the Quetta regional shura. *See supra* Section III.C. Each remaining plaintiff must still demonstrate that the attack in which they were injured "was caused by" Iran's "provision of material support" to the syndicate. 28 U.S.C. § 1605A(a)(1). This element does not require that Iran's material support went "directly for the specific act" of terrorism or that Iran "specifically intended or directly advanced" these particular attacks. *Owens*, 864 F.3d at 799 (cleaned up). The FSIA requires only a showing of proximate cause—*i.e.*, that Iran's support to the syndicate was "a 'substantial factor' in the sequence of events that led to the [] injur[ies]," and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran's] conduct." *Id.* at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). "These requirements are met where a state sponsor of terrorism provides material support that enhances a terrorist group's ability to attack, even where that support is not directly traceable to a specific attack." *Baker*, 2025 WL 2480075, at \*18.

At least one court in this District has concluded that, given the Taliban's decentralized structure, it cannot, without evidence, infer that Iran's provision of resources to "one component of the Taliban would necessarily have enhanced the operational capacity of another." *Sibley*, 2025 WL 1928036, at \*1. In this case, however, Plaintiffs have sufficiently shown that Iranian money flowed through the Taliban's central leadership and was likely redistributed to the local groups—

the Haqqani Network and the Quetta regional shura—that carried out the attacks on Boothe, Bland, and Murtha. *See supra* Section III.B. "The fact that the money was received by Taliban leadership and then distributed to fighters undoubtedly increased the[ir] organizational capacity . . . to carry out terrorist attacks." *Baker*, 2025 WL 2480075, at *19. In particular, this financial aid helps explain how these insurgents afforded the personnel, vehicles, explosives, and other weapons needed to carry out the attacks. *See* Wood Report (Mar. 2025) ¶¶ 82, 111, 127. The court is mindful, moreover, of the D.C. Circuit's instruction that money "is fungible" and "careful bookkeeping records" cannot be expected. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004); *see also Prezwozman v. Islamic Republic of Iran*, 754 F. Supp. 3d 1, 22 (D.D.C. 2024) ("[F]unds are fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on [the Taliban's] careful bookkeeping." (cleaned up)). Accordingly, given the evidence of Iran's robust financial support for the Taliban and the Taliban's centralized finance operation, the court is satisfied that Iran's financial aid "played a significant role in aiding [the] operational capacity" of the Haqqani Network and Quetta regional shura, and that Iran's support was therefore a substantial factor leading to the attacks. *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 61 (D.D.C. 2021).

Plaintiffs have also established that these attacks were the "natural consequence" of Iran's support. *Owens*, 864 F.3d at 794. After all, Iran placed bounties on the heads of American soldiers, explicitly tying its financial support to the Taliban's commission of deadly attacks like the ones on Boothe, Bland, and Murtha. *See* Clarke Report (Mar. 2025) at 36; *see also* Roggio Report ¶ 224. Proximate causation is therefore satisfied.

3.  Remaining Preconditions

28 U.S.C. § 1605A(a)(2) establishes three additional conditions that "must be met for the terrorism exception to apply." *Borochov*, 94 F.4th at 1057.  First, Iran must have been designated as a state sponsor of terrorism at the time of the act or was subsequently so designated because of the act.  *See id.* (citing 28 U.S.C. § 1605A(a)(2)(A)(i)(I)).  That condition is met here because the U.S. State Department has designated Iran as a state sponsor of terrorism since 1984.  *See supra* Section III.  Second, either a victim of the act or the claimant in the suit must be an American national, a member of the U.S. armed forces, or an employee or contractor for the U.S. government acting within the scope of their employment.  *Borochov*, 94 F.4th at 1057 (citing § 1605A(a)(2)(A)(ii)).  That condition is likewise met because all Plaintiffs have been U.S. citizens since birth.  *See supra* Section III.  Finally, if "the act occurred in the foreign state against which the claim has been brought," the claimant must give the foreign state a "reasonable opportunity" to arbitrate prior to filing a lawsuit.  *Borochov*, 94 F.4th at 1057 (quoting § 1605A(a)(2)(A)(iii)).  Arbitration is unnecessary here because the relevant attacks occurred in Afghanistan, not Iran.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012) ("Because the offending act did not occur in the foreign state against which the claim is brought, the plaintiff is not required to afford the defendants an opportunity to arbitrate his claim.").  Accordingly, Boothe, Bland, Murtha, and their family members, have established this court's subject matter jurisdiction over their claims.

**B.  Personal Jurisdiction**

Under the FSIA, "[p]ersonal jurisdiction over a foreign state shall exist as to every claim" for which an exception to its sovereign immunity applies and "where service has been made under section 1608."  28 U.S.C. § 1330(b).  "In other words, under the FSIA, subject matter jurisdiction

plus service of process equals jurisdiction." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (cleaned up). Having already concluded that this court has subject matter jurisdiction over claims related to Boothe, Bland, and Murtha, the court will now determine whether Plaintiffs properly served Iran.

Section 1608 "prescribes four methods of service, in descending order of preference." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008). "Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Id.* Under the first method, a plaintiff must serve the foreign state "in accordance with any special arrangement for service" that exists between that plaintiff and the foreign state. *See* 28 U.S.C. § 1608(a)(1). "[I]f no special arrangement exists," the second method provides that a plaintiff shall deliver "a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). "The first two mechanisms for effecting service are not available to Plaintiffs in this case because there is neither a 'special arrangement' that governs service between Plaintiffs and Iran nor is Iran a 'party to an 'international convention on service of judicial documents.'" *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61–62 (D.D.C. 2019) (quoting *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 107 (D.D.C. 2019)); *see also* Pls.' Br. at 19. Nor could Plaintiffs effect service under the third method, which provides that the Clerk of the Court may mail certain documents "to the head of the ministry of foreign affairs of the foreign state concerned" "by any form of mail requiring a signed receipt." 28 U.S.C. § 1608(a)(3). As Plaintiffs have adequately demonstrated, American carriers do not deliver mail to Iran. *See* Pls.' Notice ¶¶ 3–5, ECF No. 8; *see also* ECF Nos. 8-1, 8-2, 8-3, 8-4.

Accordingly, Plaintiffs resorted to the fourth method of service—and did so successfully. *See* 28 U.S.C. § 1608(a)(4). In accordance with that provision, the Clerk of the Court mailed two copies of the summons, complaint, and notice of suit—as well as a translation of each into Iran's official language—by registered mail to the U.S. Department of State. *See* Certificate of Mailing, ECF No. 12. The State Department then transmitted those documents to Iran through diplomatic channels and confirmed that the papers were delivered to Iran on March 6, 2023. *See* Return of Service, ECF No. 13. Accordingly, Iran has been properly served and personal jurisdiction exists.

## C. Liability

In addition to establishing the terrorism exception to foreign sovereign immunity, 28 U.S.C. § 1605A creates a private right of action for certain plaintiffs injured by a state sponsor of terror. *See* 28 U.S.C. § 1605A(c). That private right of action "overlap[s] with the terrorism exception to sovereign immunity, so the court's subject matter jurisdiction analysis shows that the . . . cause of action is available here." *Borochov v. Islamic Republic of Iran*, 589 F. Supp. 3d 15, 35 (D.D.C. 2022) (citing *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also M.M. v. Islamic Republic of Iran*, 708 F. Supp. 3d 22, 46 (D.D.C. 2023) ("Congress made the elements of this new cause of action coextensive with the immunity waiver[.]"). The Plaintiffs who established this court's subject matter jurisdiction, therefore, have a cause of action under § 1605A(c).

Courts in this District are split, however, as to whether this immunity and cause-of-action determination also ends the liability analysis. *See Foley v. Syrian Arab Republic*, 804 F. Supp. 3d 229, 243 (D.D.C. 2025) (documenting the split). Some courts have reasoned that although the immunity and liability inquiries "are conceptually different," they are nevertheless "functionally overlapping" such that "a plaintiff 'who establishes a waiver of foreign sovereign immunity'" and

a cause of action under § 1605A "also 'establishes entitlement to relief as a matter of law.'"  *Id.*

(quoting *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 176 (D.D.C. 2020)); *see also*

*Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (holding that "the

elements of immunity and liability . . . are essentially the same," such that if the immunity waiver

applies and a cause of action exists, liability is established).  Under this view, "'liability . . . will

exist whenever the jurisdictional requirements'" of the terrorism exception "are met."  *Foley*, 804

F. Supp. 3d at 243 (quoting *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C.

2017)).

Other courts have found that although § 1605A "creates a private right of action, 'it does

not provide guidance on the substantive bases for liability that determine plaintiffs' entitlement to

damages."  *See Estate of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 156 (D.D.C. 2024)

(quoting *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 137 (D.D.C. 2018));

*see also Pautsch*, 2024 WL 3566132, at *5 (same).  Thus, even after establishing the applicability

of the terrorism exception and existence of a cause of action, plaintiffs must still "prove a theory

of liability under which defendants cause[d] the requisite injury or death."  *Valore v. Islamic*

*Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010); *see also Friends of Mayanot Inst. v.*

*Islamic Republic of* Iran, 313 F. Supp. 3d 50, 61 (D.D.C. 2018) ("In order to satisfy the statutory

elements of causation and injury, plaintiffs in actions arising under companion Section 1605A(c)

'must articulate justification for such recovery, generally through the lens of civil tort liability.'"

(quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 176 (D.D.C. 2010))).  "[T]o

define the elements and scope of these theories of recovery," courts which follow this approach

look to "well-established principles of law, such as those found in the Restatement (Second) of

Torts and other leading treatises, as well as those principles that have been adopted by the majority

of state jurisdictions." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014) (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)).

The court need not decide between these two approaches in this case. Under either approach, the remaining Plaintiffs have adequately established Iran's liability. Under the first approach, the remaining Plaintiffs have clearly established Iran's liability because liability exists whenever the terrorism exception and § 1605A(c) cause of action are satisfied. *See Foley*, 804 F. Supp. at 243. The remaining Plaintiffs can also recover under the second, more demanding approach because they can point to theories of liability that are well established in tort law.

First, Iran is liable to Boothe, Bland, and Murtha under a theory of battery, which requires a showing that Iran (1) "acted 'intending to cause a harmful contact with . . . or an imminent apprehension of such contact' by, those attacked" and (2) "'a harmful contact with' those attacked 'directly or indirectly resulted.'" *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010) (quoting Restatement (Second) of Torts § 13). "Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Id.* (quoting Restatement (Second) of Torts § 15).

Both elements are met here. Iran, in, among other things, placing bounties on the head of American soldiers, plainly intended for its material support to the Taliban to result in harmful contacts against American service members. *See Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 44 (D.D.C. 2023); *see also* Clarke Report (Mar. 2025) at 36; Roggio Report ¶ 224. And Iran's material support indirectly led to the serious physical injuries that Boothe, Bland, and Murtha sustained from Taliban-initiated attacks. *See supra* Section IV.A.2.

The remaining Family Member Plaintiffs—M.B., J.B., G.B., and McHenry—sue for loss of solatium, *see* Pls.' Br. at 38, which is "the mental anguish, bereavement, and grief" experienced

by individuals close to a victim. *Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 140 (D.D.C. 2018). Under the FSIA, a solatium claim is "'nearly indistinguishable from a claim for' intentional infliction of emotional distress." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 357 (D.C. Cir. 2018) (quoting *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015)). For these Family Member Plaintiffs to establish Iran's liability for IIED, they must show that Iran "(1) engaged in extreme and outrageous conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or recklessly caused severe emotional distress . . . (4) to such persons' immediate family members," (5) "who were present at the time such conduct occurred." *Murphy*, 740 F. Supp. 2d at 75 (citing Restatement (Second) of Torts § 46)).

The first four requirements are easily met here. To start, "acts of terror are inherently 'extreme and outrageous'" and done with the very purpose of inflicting maximum emotional distress. *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 135 (D.D.C. 2019) (quoting *Valore*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010)); *see also Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (acts of terrorism are, by their nature, designed "to create maximum emotional impact, particularly on third parties" (cleaned up)). The remaining Family Member Plaintiffs are all immediate family members of the direct targets of the terrorist attacks—U.S. service members deployed to Afghanistan. *See Murphy*, 740 F. Supp. 2d at 75. And each of these family members suffered severe emotional distress. *See infra* Part V.

Although family members must usually be present at the time of the extreme and outrageous conduct to recover for IIED—and none of these family members were present during the terrorist attacks at issue in this case—that does not bar these Plaintiffs' claims. "[B]ecause of the outrageousness of an act of terrorism, courts have waived the Restatement's presence requirement for family members so long as they suffer mental anguish and trauma as a result of

the attack." *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 34 (D.D.C. 2022); *see also Republic of Sudan v. Owens*, 194 A.3d 38, 45 (D.C. 2018) ("We see little need to enforce the presence requirement in IIED cases where the [terrorism exception of the FSIA applies] and the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family."). Accordingly, Iran is liable to the Family Member Plaintiffs for IIED.

## V.    DAMAGES

Under the FSIA, a victim of state-sponsored terrorism can recover "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). To recover such damages, a default FSIA winner "must prove damages in the same manner and to the same extent as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 683–84 (D.C. Cir. 2003) (cleaned up). Thus, for damages already suffered, the default winner must "reasonably prove[]" both that they suffered damages and the amount of those damages. *Id.* at 684 (quoting DOBBS LAW OF REMEDIES § 8.1(2), at 361–62, § 8.1(7) at 407 (2d ed. 1993)). For projected future damages, the default winner must prove that those damages "are reasonably certain . . . to occur," and must establish "the amount of damages by a reasonable estimate." *Id.* (cleaned up); *see also Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997).

### A.  Pain and Suffering

Plaintiffs Boothe, Bland, and Murtha each seek $7 million in compensatory damages for their pain and suffering. Pls.' Br. at 40–45, 48–54, 82–84. "Each victim's suffering is unique," and thus it is difficult to compare one person's anguish to that of another. *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009). Nevertheless, because like cases should be treated alike, courts "must take pains to ensure that individuals with similar injuries receive similar awards." *Valore*, 700 F. Supp. 2d at 84 (cleaned up). To that end, courts in this District

have coalesced around a general framework for awarding damages. Under that general framework, "[c]alculating damages begins with the baseline assumption that 'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). Courts will "deviate upward in the presence of 'severe instances of physical and psychological pain'" and "downward in the face" of more minor injuries. *Id.* (quoting *Valore*, 700 F. Supp. 2d at 84).

To determine the relative degree of injury suffered by Boothe, Bland, and Murtha, Plaintiffs urge the court to rely on the disability ratings issued by the Department of Veterans Affairs ("VA"). *See* Pls.' Br. at 37. The court agrees this is a sensible approach. "The VA disability rating constitutes a specialized agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *74 (D.D.C. June 27, 2019) (cleaned up). It thus provides a "more objective metric" for evaluating the extent of a service member's injuries and helps ensure that service members with a similar level of disability receive a similar level of compensation. *Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104, 110 (D.D.C. 2021) (cleaned up). Other courts in this District have used the following rubric: Service members with a disability of up to 30% typically receive the $5 million baseline, "those rated 40–60% disabled" receive an upward departure to $6 million, and those rated 70–100% disabled receive a further upward departure to $7 million. *Id.* (citing *Schooley*, 2019 WL 2717888, at *74); *see also Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 45–46 (D.D.C. 2023) (following this approach).

### 1. Captain Boothe

The court agrees that Captain Boothe is entitled to $7 million for her severe pain and suffering. During the August 7, 2012, terrorist attack on FOB Shank, Boothe was thrown backwards and knocked to the ground when a vehicle-borne IED containing 5,000 pounds of ammonium nitrate detonated approximately 15 meters away from her. Boothe Decl. ¶ 7. As a result of the bombing, Boothe sustained a severe traumatic brain injury ("TBI") and post-traumatic stress disorder ("PTSD"). *Id.* ¶¶ 8–9; *see also* Boothe Decl. – Ex. E & Ex. F (medical records documenting these diagnoses). To this day, Boothe continues to experience daily migraine-type headaches and other "widespread cognitive problems" which have left her unable to work. Boothe Decl. ¶¶ 9–11, 17. She also continues to suffer from severe PTSD: She "remain[s] in a constant state of alert, fearing another bomb attack," and frequently experiences "intrusive memories and images of the blast in Afghanistan." *Id.* ¶ 16. Boothe received a 100% disability rating from the VA in connection with her TBI and a 70% disability rating in connection with her PTSD. *See* Boothe Decl. – Ex. F (disability rating). Given these severe disabilities, the court will award Captain Boothe $7 million for her pain and suffering.

### 2. Specialist Bland

Specialist Bland is likewise entitled to $7 million in damages for pain and suffering. As noted above, Bland was thrown six feet in the air and rendered unconscious during a suicide attack. Bland Decl. ¶ 12. Ball bearings from the bomb punctured his right thigh, causing significant damage to his sciatic nerve and requiring Bland to undergo surgery. *Id.* ¶¶ 12–13. As a result of the surgery, Bland's right peroneal nerve was also injured. *Id.* ¶ 16. Bland continues to experience hip and knee issues. *Id.* ¶ 16. As a result of the attack, he also suffers from mild TBI, recurring tinnitus, cervical spine strain, and a lower back injury, as well as frequent panic attacks, insomnia,

depression, and speech issues.  *Id.* ¶¶ 15, 18–19.  Bland has a combined VA disability rating of 90%.  Bland Decl. – Ex. G (VA disability rating).  His injuries are therefore severe enough to warrant an upward deviation to $7 million.

### 3.   Private Murtha

As noted above, Private Murtha was ten feet away from a suicide bomber when the bomber detonated his explosives.  Murtha Decl. ¶ 4.  Shrapnel from the explosion tore into his left leg, buttock, neck, left arm, and right leg, resulting in "excruciating pain."  *Id.* ¶ 5.  Murtha underwent seven surgeries and over a year of painful physical therapy.  *Id.* ¶¶ 6–7.  In addition, Murtha sustained cranial nerve dysfunction, other nerve damage, TBI, vertigo, tinnitus, chronic migraines, and scarring, as well as PTSD and suicidal ideations.  *Id.* ¶¶ 8–10, 12.  He has a combined VA disability rating of 100%.  *Id.* ¶ 9; *see also* Murtha Decl. – Ex. F.  Given the severity of his injuries, the court will award Murtha $7 million in damages for pain and suffering.

## B.  Economic Damages

Boothe, Bland, and Murtha also seek economic damages due to lost earnings.  Pls.' Br. at 40–45, 48–54, 82–84.  Under the FSIA, injured victims may recover economic damages, which can include lost wages, benefits and retirement pay, lost household services, and other out-of-pocket expenses.  *See* 28 U.S.C. § 1605A(c); *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 77 (D.D.C. 2014) (finding household services lost recoverable).  To recover expected future damages, a plaintiff must (1) prove that those damages "are reasonably certain . . . to occur," and (2) establish "the amount of damages by a reasonable estimate."  *Hill*, 328 F.3d at 684 (cleaned up).  A reasonable estimate "may be proven by the submission of a forensic economist's expert report," provided the expert relied on reasonable and well-founded assumptions.  *Roth*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015).

All three Plaintiffs submitted reports from Chad Staller and Stephen Dripps of the Center for Forensic Economic Studies. *See* Ex. 6, Boothe Economic Loss Report, ECF No. 25-1; Ex. 7, Bland Economic Loss Report, ECF No. 25-2; Ex. 9, Murtha Economic Loss Report, ECF No. 25-4. The court will qualify both Staller and Dripps as experts and admit their reports into evidence. To start, Staller has a master's degree in accounting from Villanova University, Dripps has a master's degree in finance from Pennsylvania State University, both are accredited by the National Association of Certified Valuation Analysts, and both have extensive experience as forensic accountants. *See* Boothe Economic Loss Report at 19–26. Both have also been qualified by other courts in this District as experts in forensic accounting. *See, e.g.*, *Selig*, 573 F. Supp. 3d at 51 n.1; *M.M. v. Islamic Republic of Iran*, 708 F. Supp. 3d 22, 49 (D.D.C. 2023).

In calculating each Plaintiff's economic loss, Staller and Dripps reviewed relevant data, including each Plaintiff's Social Security earning history, tax returns, and declarations. *See, e.g.*, Boothe Economic Loss Report at 3. The experts accounted for the lost past and future earnings of each Plaintiff by taking their past recent earnings, adjusting for several variables, including wage growth and taxes, and discounting to present value using the average yield rate of high-grade municipal bonds. *See, e.g.*, *id.* at 3–10. This court is thus satisfied that Staller and Dripps' estimates are based on sufficient data and are derived from reliable principles and methods. *See* FED. R. EVID. 702.

In calculating Bland and Murtha's lost earnings, Staller and Dripps offered two estimates. The higher estimates were based on the Social Security retirement age of 67 while the lower estimates were based on an earlier retirement age at each Plaintiff's end of his statistical work life expectancy. *See, e.g.*, Bland Economic Loss Report at 3. Given Bland and Murtha's status as ambitious, productive members of society before they were injured, the court will assume that they

would have worked until the Social Security retirement age and adopt the higher end estimates. *See Selig*, 573 F. Supp. 3d at 69 (awarding the upper range of economic loss because of the victim's "entrepreneurial drive and spirit" and likelihood that he "would have worked until at least [the] age [of] 67"); *Goodwin v. Syrian Arab Republic*, No. 23-CV-267, 2025 WL 1411302, at *11 (D.D.C. May 15, 2025) ("Conforming to a number of cases from this District, . . . it is most reasonable to assume that [a plaintiff] would work until the age of 67."). The court therefore finds Bland's total economic damages to be $1,696,432 and Murtha's total economic damages to be $3,181,201. Bland Economic Loss Report at 10, 12; Murtha Economic Loss Report at 12, 14.

Staller and Dripps also offered two estimates for Captain Boothe, who retired from the military in 2014 because of the attack. The first estimate assumed that Boothe would have served in active duty until 2028, at which point she would have accrued 20 years of active-duty service and vested in the High-36 military pension plan. The second estimate assumed that even if the attack did not occur, Boothe would have still separated from the military in 2014 and returned to the civilian workforce. *See* Boothe Economic Loss Report at 2–4. Boothe averred that she only separated from the military in 2014 because of her attack-related injuries and that she would have remained in the Army as long as she could have. Boothe Decl. ¶ 17. The court will credit her testimony and adopt the first estimate. The court therefore finds Boothe's total economic damages to be $2,740,506. *See* Boothe Economic Loss Report at 11, 17.

### C. Solatium Damages

The four remaining Family Member Plaintiffs each request $3.5 million in solatium damages. Pls.' Br. at 45–47, 54–57, 84. Those Plaintiffs are M.B., Captain Boothe's son; J.B. and G.B., Specialist Bland's children; and Kelley McHenry, Private Murtha's mother.

As noted above, solatium damages seek to compensate the relatives of a victim for the "mental anguish, bereavement, and grief" that the relatives suffered because of the death or injuries sustained by their loved one. *Fraenkel*, 892 F.3d at 356–57 (cleaned up). "Only immediate family members—parents, siblings, spouses, and children are entitled to solatium awards." *Opati*, 60 F. Supp. 3d at 79. Courts in this District typically award the parents and children of a victim who survived but was injured in a terrorist attack $2.5 million each. *See Heching v. Syrian Arab Republic*, No. 17-cv-1192, 2025 WL 2959909, at *5 (D.D.C. Oct. 20, 2025). Thus, the baseline for M.B., J.B., G.B., and McHenry is $2.5 million each.

As Plaintiffs emphasize, this baseline is "not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). But given the importance of consistency across cases and the fact that the baseline amount already accounts for the severe distress that a family member typically suffers from having a loved one fall victim to a terrorist attack, "deviations are generally not warranted absent evidence of 'unusual' circumstances." *Heching*, 2025 WL 2959909, at *4 (quoting *Roth*, 78 F. Supp. 3d at 405); *see also Kenny v. Islamic Republic of Iran*, No. 22-cv-3299, 2024 WL 4297682, at *10 (D.D.C. Sept. 26, 2024) (explaining that the "baseline award was calculated to try to compensate" the "substantial" grief that family members typically experience and an upward departure is not warranted absent "unusually severe" anguish). More specifically, an upward variation is typically only warranted if one of three conditions is met: (1) the attack victim and the family member had an unusually close relationship beyond what is "to be expected," (2) there are aggravating circumstances surrounding the attack that would make it more traumatic for a victim's relative than would normally be the case, or (3) there is medical proof that the family member suffered unusually severe pain, grief, or suffering as a result of their loved one's injuries. *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011); *see also Heching*,

Page 33 of 37

2025 WL 2959909, at *4 ("[A]n upward deviation may be appropriate if the relative of a victim suffers unusually severe mental anguish leading to suicidal thoughts and attempts." (cleaned up)).

The court is deeply sympathetic to Plaintiffs and does not mean to minimize their immense suffering. Nevertheless, the court is constrained to conclude that the $2.5 million baseline adequately accounts for their loss of solatium and that they have not shown any unusually severe circumstance that would "warrant treating [their] grief as greater than that of other victims who have [had] cherished family members [injured by] terrorism." *Heching*, 2025 WL 2959909, at *5. After all, the significant baseline sum of $2.5 million is designed to reflect the fact that a traumatic terrorist attack generally has a severe emotional impact on the close family of the victims.

To start, although Captain Boothe avers that M.B. fell into a deep depression and cut himself after she was attacked, Boothe provides no medical evidence to support her characterization of the intensity of M.B.'s anguish nor does she aver that M.B. did something as serious as attempting suicide. *See* Boothe Decl. ¶¶ 21–28. Without the opinion of a medical professional, other medical records, or a declaration from M.B. himself, *see* Pls.' Br. at 45 (noting that M.B. himself did not file a declaration), the court lacks sufficient evidence to infer that M.B.'s anguish was so unusually severe that it warrants a million-dollar upward departure. *See Oveissi*, 768 F. Supp. 2d at 27 (requiring "medical proof" to justify upward departure); *see also Kenny*, 2024 WL 4297682, at *10 (anguish must be "unusually severe" to warrant upward deviation). And although Captain Boothe's injuries were relatively severe, there is nothing to indicate that the circumstances surrounding her attack were so unusually heinous that it would "appreciably worsen" her family members' suffering; there are, for example, no allegations that Boothe was tortured or kidnapped. *See id.* at 27 (quoting *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006)).

Page 34 of 37

Nor is there adequate evidence to conclude that J.B. and G.B. are entitled to an upward deviation. The only evidence Plaintiffs submitted with respect to J.B. and G.B. is a declaration from Specialist Bland. *See* Pls.' Br. at 54–57. He avers that because of the attack and the impact it had on him, his son J.B. became distant, started getting in trouble at school, and having other behavioral issues. Bland Decl. ¶ 24. But nothing in Bland's Declaration indicates that J.B.'s struggles were unusually severe for the child of a victim of terrorism; in fact, Bland avers that J.B. "started to get better after a few years." *Id.* ¶ 25.

With respect to his daughter G.B., Bland avers that because of his PTSD, he divorced G.B.'s mother, which caused G.B. to develop abandonment issues. Bland describes G.B.'s anguish as more intense than J.B.'s—unlike J.B., G.B. cut herself. Bland Decl. ¶ 26. But as with M.B., there is no medical proof regarding the intensity of G.B.'s anguish and no indication that G.B. did something as severe as attempting suicide. Nor is there any evidence that the attack which injured Specialist Bland was especially, unusually heinous.

The record likewise does not support an upward departure for Kelley McHenry. Although the court does not doubt that she is a devoted mother whose relationship with her son, Private Murtha, has been seriously strained by the attack, *see* McHenry Decl. ¶¶ 2, 18, ECF No. 28-2, nothing in McHenry's declaration permits the conclusion that her circumstances are unusually severe when compared to those of other mothers whose children have been injured in similar attacks. While the court is deeply sympathetic to M.B., J.B., G.B. and McHenry, the court "must [also] take pains to ensure that individuals with similar injuries receive similar awards." *Valore*, 700 F. Supp. 2d at 84. Accordingly, the court will award each of these Plaintiffs the baseline sum of $2.5 million.

### D. Punitive Damages

Plaintiffs next "request an award of punitive damages equal to their aggregated compensatory damages award." Pls.' Br. at 89. Courts in this District frequently multiply total compensatory damages by a factor as large as five, *see Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 65 (D.D.C. 2018), so Plaintiffs' request is quite modest in comparison. To be sure, such large multipliers are generally reserved for particularly severe and reprehensible attacks and Plaintiffs would likely not be entitled to a large multiplier here. *Id.* But Plaintiffs' request for an "amount of punitive damages equal to compensatory damages" is plainly "commensurate with the character of Defendants' acts and the nature and extent of the harm caused" and cannot be criticized as excessive. *Selig*, 573 F. Supp. 3d at 77. The court therefore finds Plaintiffs' request reasonable and will award punitive damages to each remaining Plaintiff in an amount equal to their compensatory damages award.

### E. Post-Judgment Interest

Finally, Plaintiffs seek the award of post-judgment interest. Pls.' Br. at 89. As relevant in this case, 28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and that "[s]uch interest shall be calculated from the date of the entry of judgment." *Id.* Application of § 1961(a) is mandatory, not discretionary. *See, e.g.*, *Lanny J. Davis & Assocs. v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013) (citing *Cont'l Transfert Tech. Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012)). The court will therefore award Plaintiffs post-judgment interest at the statutory rate set out in 28 U.S.C. § 1961.

## VI.    CONCLUSION

For the above reasons, the court will GRANT in part and DENY in part Plaintiffs' Motion for Default Judgment.  A corresponding order will follow.


Date:    March 24, 2026


*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge